RECEIVED
USDC, WESTERN DISTRICT OF LA
TONY R. MOORE, CLERK
ALEXANDRIA, LOUISIANA
DATE 8 31 11
BY

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

ALEXANDRIA DIVISION

HUEY RICHARDS,
            Petitioner

VERSUS

WARDEN, LOUISIANA STATE
PENITENTIARY,
            Respondent

CIVIL ACTION
SECTION "P"
1:10-CV-00325

JUDGE DEE D. DRELL
MAGISTRATE JUDGE JAMES D. KIRK

## REPORT AND RECOMMENDATION OF MAGISTRATE JUDGE

Before the court is a petition for writ of habeas corpus filed pursuant to 28 U.S.C. § 2254 by petitioner Huey Richards ("Richards") on February 16, 2010. Richards is contesting his 2006 conviction by a jury, in the Louisiana Ninth Judicial District Court in Rapides Parish, on one count of second degree murder, for which he was sentenced to life imprisonment. Richards raises the following grounds for habeas relief:

> 1. Whether the evidence against Richards was insufficient to convict him of second degree murder, and thus a violation of his Sixth and Fourteenth Amendment constitutional rights.

> 2. Whether Richards' state and federal constitutional rights, under the Sixth and Fourteenth Amendments, were violated because defense counsel was ineffective for failing to adequately investigate, prepare, and present evidence of Richards' history of mental illness, which rendered him incompetent to assist with his defense and/or incompetent to stand trial.

3. Whether Richards' state and federal constitutional rights, under the Sixth and Fourteenth Amendments, were violated because defense counsel was ineffective for failing to adequately investigate, prepare and present evidence of Richards' history of mental illness, which deprived Richards of a defense of insanity at the time of the offense.

4. Whether Richards' procedural due process rights were violated because the trial court failed to stop the proceedings for a determination of Richards' competency, in violation of his constitutional rights under the Sixth and Fourteenth Amendments.

Richards alleges and the Respondent admits exhaustion of Richards' state court remedies. The Respondent answered the petition (Doc. 11), and Richards' habeas petition is now before the court for disposition.

## Rule 8(a) Resolution

This court is able to resolve the merits of this <u>habeas corpus</u> petition without the necessity of an evidentiary hearing because there is no genuine issue of material fact that is relevant to the petitioner's claims, and the State court records provide the required and adequate factual basis necessary to the resolution of the habeas corpus petition. <u>Moya v. Estelle</u>, 696 F.2d 329, 332-33 (5th Cir. 1983); <u>Easter v. Estelle</u>, 609 F.2d 756, 761 (5th Cir. 1980); Habeas Corpus Rule 8(a).

## Standard of Review

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall be considered only on the ground that he is in custody in violation

of the Constitution or laws or treaties of the United States.  28
U.S.C. § 2254(a).

Under 28 U.S.C. § 2254 and AEDPA, which is applicable to
habeas petitions filed after its effective date on April 24, 1996,
habeas relief is not available to a state prisoner with respect to
a claim that was adjudicated on the merits in the State court
proceedings unless the adjudication of the claim (1) resulted in a
decision that was *contrary to*, or involved an *unreasonable
application of*, clearly established Federal law as determined by
the Supreme Court of the United States; or (2) resulted in a
decision that was based on an *unreasonable determination* of the
facts in light of the evidence presented in the State Court
proceeding.  Therefore, pure questions of law and mixed questions
of law and fact are reviewed under Section 2254 (d)(1), and
questions of fact are reviewed under Section 2254(d)(2).  Martin v.
Cain, 246 F.3d 471, 475-76 (5th Cir. 2001), cert. den., 534 U.S.
885, 122 S.Ct. 194 (2001), and cases cited therein.

A state court decision is "contrary to" clearly established
Supreme Court precedent if the state court applies a rule that
contradicts the governing law set forth in Supreme Court cases, or
confronts a set of facts that are materially indistinguishable from
a decision of the Supreme Court and nevertheless arrives at a
result different from Supreme Court precedent.  A state court
decision falls within the "unreasonable application" clause when it

unreasonably applies Supreme Court precedent to the facts. Martin, 246 F.3d at 476, and cases cited therein.

When a state court determines that a constitutional violation is harmless, a federal court may not award habeas relief under Section 2254 unless the harmlessness determination itself was unreasonable. Mitchell v. Esparza, 540 U.S. 12, 124 S.Ct. 7 (2003).

## Facts

The facts of this case, as set forth by the Louisiana Third Circuit Court of Appeal at State v. Richards, 06-1553 (La. App. 3d Cir. 2007), 956 So.2d 160, 162-169, writ den., 2007-KO-1129 (La. 12/14/2007), 970 So.2d 529, are as follows:

> "A month after the February 24, 2005 murder of La'Kedric Quinney, the Rapides Parish Grand Jury indicted the defendant, Huey Lee Richards, with committing the first degree murder of Mr. Quinney.
>
>        *           *          *
>
> "The first witness called by the State in this matter was Appifanny Randall. Ms. Randall is the seventeen-year-old mother of the victim's child. Although Mr. Quinney had been living with his mother in Baton Rouge, he had moved in with Ms. Randall about a week before he disappeared. On the evening of February 23, 2005, Mr. Quinney and Ms. Randall had been riding around in a white Cadillac Mr. Quinney had borrowed from Defendant. After making several stops, Mr. Quinney and Ms. Randall returned their sleeping infant home.
>
> "Mr. Quinney and Ms. Randall left again and went to the store. Ms. Randall stayed in the car while Mr. Quinney went inside. When he returned to the car at about 2:00 a.m., he had a signed check. The defendant had given Mr. Quinney the check in repayment for some crack cocaine Mr. Quinney had sold to the defendant. When Ms. Randall's mother refused to cash the check, Mr. Quinney, saying it was too late, returned the check to the defendant inside

the store. Before returning to the store, Mr. Quinney
expressed to Ms. Randall his anger at the defendant and
his reluctance to re-enter the store, explaining that the
reluctance was because the defendant was naked. In
exchange for the check, the defendant gave him a credit
card bearing a woman's name. Mr. Quinney then
unsuccessfully tried to use the credit card to withdraw
cash at Red River Bank. Ms. Randall thought that the card
had been stolen and told Mr. Quinney her suspicion.

"Ms. Randall and Mr. Quinney returned to the store. When
they arrived, a woman was standing outside of the store.
The defendant and the woman were the only people at the
store. The woman stopped Mr. Quinney and spoke to him as
he approached the store. Ms. Randall believed that the
woman was asking Mr. Quinney for crack. Ms. Randall did
not think that Mr. Quinney gave her anything before he
entered the store because the woman yelled, "I got $2-I
got $2." After awhile, the woman followed Mr. Quinney
into the store, and Mr. Quinney exited. When Mr. Quinney
got into the car, he told Ms. Randall that the defendant
had told him to go to Hibernia instead of the Red River
Bank.

"Ms. Randall and Mr. Quinney went to Hibernia, and Ms.
Randall got out of the car because Mr. Quinney had been
taking too long. Mr. Quinney told her that the card had
gotten stuck in the ATM and that only happened when the
card was stolen. After leaving Hibernia, Mr. Quinney
dropped Ms. Randall off at home. Ms. Randall told Mr.
Quinney that he should not return to the store. Ms.
Randall asked Mr. Quinney to remain at home, but he said
that he would be back in five minutes and left. When she
awoke around 5:00 a.m., Ms. Randall noticed that Mr.
Quinney was not home and called Bernice Quinney, Mr.
Quinney's mother. Ms. Randall did not see Mr. Quinney
again.

"When Ms. Randall returned to the store looking for Mr.
Quinney, she saw the defendant's car parked outside and
encountered the defendant's wife when she entered the
building. Speaking rapidly and shaking her head, the
defendant's wife denied having seen the defendant or Mr.
Quinney and said that the defendant was at the casino.
The defendant's wife told Ms. Randall that she did not
know how she had gotten the white Cadillac back from Mr.
Quinney or the defendant. The defendant's wife followed
Ms. Randall out of the store, then locked up, and left in

the car. Ms. Randall and her family continued to search for Mr. Quinney over the next ten days. They also posted missing person flyers that Ms. Quinney and Ms. Randall's aunt had made.

"Later, Ms. Randall returned to the store with Ms. Quinney and they encountered the defendant while he was being questioned by the police. Ms. Randall saw that the defendant's face was scratched. The defendant told them that Mr. Quinney had slid the car keys under the store's door and had left with some men with ecstasy pills. Ms. Randall attempted to tell the police that it would be impossible to slide car keys under the store's door. Ms. Randall and Ms. Quinney exited the store when the police told them to leave, but Ms. Randall and some of her family went back later.

"In all the time Ms. Randall had known Mr. Quinney, she never saw him with a gun. Mr. Quinney had carried a small pocketknife for a while, but he had lost it about seven months before he disappeared. Other than the pocketknife, Ms. Randall had never seen Mr. Quinney carry a knife. Instead, Mr. Quinney seemed confident that he could defend himself without weapons. Ms. Randall described Mr. Quinney as standing about an inch under six feet and weighing 150 pounds.

"The second witness to testify for the prosecution was Gwendolyn Davenport. Ms. Davenport is addicted to crack cocaine. That night, Ms. Davenport only had $3.00, so she could not get high. Instead, she went to the store to buy snacks. As she approached the store, Ms. Davenport noticed that the lights were on, but no vehicle was parked outside. As Ms. Davenport turned to go home, she saw the defendant's vehicle turn into the store parking lot. Ms. Davenport then crossed the street so she could enter the store. As she neared the door, she heard arguing.

"Ms. Davenport waited for the arguing to calm down before she knocked. The defendant let her in and the young man who had been arguing with the defendant left while she was shopping. While inside, Ms. Davenport noticed a condom package on the counter. The defendant was wearing a T-shirt, but he was naked from the waist down. Ms. Davenport did not leave. Instead, she stayed at the store with the defendant for thirty to forty-five minutes and got high on crack cocaine supplied by the defendant.

"The young man returned after about fifteen minutes. The defendant let the young man into the store, and the young man told the defendant that an ATM card was not working and that the machine had kept the card. The young man was upset and kept repeating that he wanted his money. The defendant did not pay attention to the young man. The young man told the defendant, '[I]f I was like one of the rest of these little youngsters, I'd be whooping your-ss.' The defendant responded that the young man did not know with whom he was dealing. The defendant did not act at all worried when the young man threatened him. The defendant told the young man to take his girlfriend home and then come back to the store.

"The young man left, and the defendant asked Ms. Davenport if she wanted to accompany him and the young man to Super One. Ms. Davenport was high and feeling nervous, so she refused. When Ms. Davenport suggested that the defendant finish dressing before he left the store, the defendant yelled at her to not tell him what to do. The young man returned to the store, having dropped off his girlfriend, and Ms. Davenport left. As she was walking out, the young man told her that she was going to be reading about the defendant. The young man was not armed at any time while in Ms. Davenport's sight. Ms. Davenport did not see the young man after that night. Ms. Davenport identified the corpse depicted in the photographs marked S-7, S-8, and S-9 as the young man who was at the store that evening.

"Sergeant William Bates, a crime scene detective with the Alexandria Police Department, testified for the state. Sergeant Bates investigated Mr. Quinney's murder. During the investigation, Sergeant Bates collected two cotton swabs of blood from the defendant's carport driveway, two cotton swabs of blood from the threshold entry to defendant's house from the carport, two cotton swabs from a bloodstain on the screen door of that entry, two cotton swabs of suspected blood from the defendant's bathtub, and bloodstain swabs from the defendant's car. Sergeant Bates went to Memphis, Tennessee to execute a search warrant on the defendant's car. For comparison, the investigators took buccal swabs and blood samples from the defendant. Sergeant Bates also collected a blood sample from the victim.

"The prosecution called Connie Brown to testify as an expert in DNA analysis. Ms. Brown analyzed the blood

samples in the instant case. The blood taken from the defendant's carport screen door matched Mr. Quinney's DNA. The carport driveway and door swabs yielded no DNA evidence. The bathtub swabs matched the defendant's DNA, which is not unusual since it was the defendant's bathtub. The blood swabs from the passenger seat of the defendant's car matched Mr. Quinney's DNA.

"The state recalled Sergeant Bates. Sergeant Bates became involved in the investigation on February 29, 2005, when another officer told him that Mr. Quinney had disappeared and that the authorities suspected foul play. On March 1, 2005, Sergeant Bates participated in executing a search warrant on the defendant's store and residence to search for signs of a struggle. At the defendant's home, the officers seized a disposable camera. After searching the defendant's home, law enforcement officers began looking for Mr. Quinney's body.

"On March 3, 2005, Sergeant Bates obtained the pieces of the previously mentioned credit card from Hibernia, the bank's surveillance video, and a disposable camera defendant had given to his mother. Sergeant Bates then assisted in executing a second search warrant on the defendant's residence. This time, officers seized blood evidence. Sergeant Bates found some hand towels hanging in the bathroom that showed spots when sprayed with luminol, which reacts and fluoresces when in contact with blood.

"A tall levee on Red River borders the defendant's property. The levee is separated from Red River by woods. On March 4, 2005, a search team gathered to search the woods across the levee from the defendant's house. On the opposite side of the levee from the defendant's residence, officers discovered a trail where something had been dragged through the brush. Officers found Mr. Quinney's naked body near a pair of cinder blocks in the woods at the base of the levee. Mr. Quinney's body had been stabbed repeatedly both in front and in back. The nearby cinder blocks, which appeared to have been moved from the defendant's house, had recently been set in place. Officers repeatedly searched for Mr. Quinney's clothing and the murder weapon, but they were not able to locate them.

"Next, Sergeant Bates executed the search warrant on the defendant's car on March 14, 2005. Sergeant Bates also

8

obtained consent to search for blood stains from the defendant's wife prior to traveling to Memphis, Tennessee, where the car had been stored. During the search, Sergeant Bates discovered two apparent stab holes in the vehicle's headliner and a graze on the plastic control center also on the car's ceiling. The search of the defendant's vehicle revealed blood, which had dried in the crevasses and seams of the car's passenger seat. Sergeant Bates submitted all of the blood samples for DNA testing.

"When Sergeant Bates executed a search warrant on the disposable camera, he had the photographs developed by the crime scene bureau's photo processing lab. The processed pictures depict the defendant with blood on him: his hands, his face, his scalp, his legs, his shirt. The blood appeared to have been transferred onto the defendant rather than bled by the defendant. Sergeant Bates' investigation revealed that the defendant's wife had taken the photographs.

"On the second day of trial, Dr. Collie Trant, a forensic pathology expert, was the first person to testify for the state. Dr. Trant became involved in the case when the coroner who performed the autopsy died. Dr. Trant issued Mr. Quinney's autopsy report. Mr. Quinney's body had many sharp force injuries and several blunt force injuries:

"(1) stab wound to the right back, seven inches deep and through the lung, inflicted with a back to front motion, possibly fatal by itself if left untreated;

"(2) stab wound to the upper right arm, inflicted with a front to back and right to left motion, possibly a defensive wound because of its position and half-inch depth;

"(3) stab wound to the upper front neck, two inches deep, inflicted with a front to back and slightly downward motion, postmortem since there was no associated hemorrhage;

"(4) stab wound to the lower front neck, two inches deep, inflicted with a front to back and slightly left to right motion, possibly fatal by itself if left untreated;

"(5) stab wound to the front lower neck, two inches deep, inflicted with a front to back and right to left motion,

eventually fatal as it punctured both the trachea and the esophagus;

"(6) stab wound to the upper middle chest/lower neck, half an inch deep, inflicted with a front to back motion, not fatal;

"(7) stab wound to the lower right side of the neck, thirty degrees from vertical, inflicted with a downward and right to left motion;

"(8) stab wound to the upper right side of the neck, four inches deep, inflicted with a downward and right to left motion, fatal without immediate treatment as it passed through both the jugular vein and carotid artery;

"(9) stab wound to the right upper chest, six inches deep, inflicted with a front to back and right to left motion, fatal as it punctured the aorta and the esophagus, caused Mr. Quinney to fall unconscious due to blood loss;

"(10) stab wound to the middle left chest, seven inches deep, inflicted with a front to back motion, pierced Mr. Quinney's lung;

"(11) cut to the right index finger, one-eighth of an inch deep, inflicted by a horizontal motion, defensive wound;

"(12) stab wound to the upper back neck, four inches deep, inflicted with a back to front motion, possibly paralyzed Mr. Quinney because it cut into the spinal cord, fatal;

"(13) stab wound to the upper left back, three quarters of an inch deep, inflicted with a back to front motion;

"(14) stab wound to the lower back neck, five inches deep, inflicted with a back to front motion, did not damage anything significant;

"(15-20) superficial stab wounds to the upper back, depth ranging from four fifths of an inch to five inches, inflicted with back to front motions, spacing indicates that Mr. Quinney was immobile when they were inflicted, none of the wounds caused significant damage;

10

"(21) cut to the top of the head, one half inch deep;

"(22) lacerations on the lips caused by a blow from a blunt object sufficiently forceful to split the skin, a large contusion to the right elbow, contusions associated with all sharp force wounds except the postmortem stab wound, abrasions on the abdomen, chest, back, arms, and face from being dragged.

"All of the stab wounds were made by a single-edge knife. The damage would have taken about ten minutes to inflict. If the injuries were inflicted in a vehicle, there would possibly be cut marks in the car due to the confined space. Also, there would be blood around Mr. Quinney in the vehicle.

"Additionally, Mr. Quinney had postmortem wounds to his genital area. The body had a hole above the penis, which had been skinned. That skin, Mr. Quinney's scrotum, and his testicles were all missing. None of the defects were made by animals although animals can cause the same type of defects. The edges of the wounds were relatively smooth rather than scalloped, showing that the genital injuries were incised by a knife instead of animal teeth.

"Dr. Trant opined that, based on the insect eggs and larvae, the body had probably been where it was found for a day or two. However, if the weather was cold, it could inhibit blowfly activity. If a body had been lying in field for the length of time it took to find Mr. Quinney, the body would be filled with maggots, and the larvae would have eaten at the wounds until it would have been difficult to determine what caused them. In contrast, Mr. Quinney's body was relatively well-preserved for the area in which it was found. Overall, the insect activity and the decomposition of the body were consistent with Mr. Quinney having been dead since his disappearance.

"The prosecution called Detective Cedric Green with the Alexandria Police Department to testify as its final witness. Detective Green was the case agent in the investigation of the disappearance and death of Mr. Quinney. Detective Green learned that the defendant had been the last person seen with Mr. Quinney. On Friday, February 25, 2005, Detective Green spoke to the defendant on the telephone, and the defendant stated that he would call Detective Green the following Monday. The defendant did not call until Tuesday, and during that conversation,

the defendant volunteered to visit Detective Green's office the next morning. The defendant insisted on having an attorney present during the interview. The defendant never reported to Detective Green's office.

"When the defendant failed to call on Monday as promised, Detective Green became suspicious. On Tuesday morning, Detective Green went by the defendant's store and discovered that it was closed, stopped at the defendant's house and found out that no one was home, and drove to the local school and learned that the defendant and his wife had withdrawn their children. Based on his findings, Detective Green became even more suspicious of the defendant, so Detective Green obtained warrants to search the defendant's home and business. During the investigation, Detective Green learned that the defendant had relatives in Tennessee. As a result, he contacted them and told them that he was looking for Mr. Quinney's body and the defendant's car.

"On Thursday, March 3, 2005, an informant told Detective Green that the defendant had returned to the area. Detective Green found the defendant's wife at the defendant's mother's house, and the defendant's wife told him that defendant was at the VA hospital. When the hospital released the defendant, Detective Green detained him and had him transported to police headquarters. The defendant's physical condition was documented when he arrived. He had a black eye and a scabbed-over injury to his right forearm.

"After speaking with the defendant, the investigators had enough information to believe that Mr. Quinney's body would be found in a wooded area near the defendant's residence. As a result, a multi-agency search team looked for Mr. Quinney's body in the wooded area behind the defendant's home. The searchers found Mr. Quinney's body the following day. When the Memphis police informed Detective Bates that they had located the defendant's car, Detective Green and Detective Bates went to Tennessee. After getting the defendant's wife's permission to search the car and a search warrant signed by a Tennessee judge, Detective Bates searched the vehicle with Detective Green present.

"In order to rebut the state's evidence, the defense called the defendant to testify as its sole witness. The defendant attested that Mr. Quinney had initiated an

incident around 3:00 a.m. by hitting the defendant in the
eye with the butt of a gun. When the defendant fell out
of his chair, Mr. Quinney again struck the defendant with
the butt of the gun, hitting the defendant's arm. Mr.
Quinney then pointed the gun at the defendant's face and
told the defendant that he was going to take everything
since the defendant owed him ninety dollars. In response,
the defendant gave Mr. Quinney the $200.00 he had in the
store as well as his watch and jewelry. Mr. Quinney kept
the gun pointed at the defendant, forced him into the
Cadillac, and made the defendant take the driver's seat
while Mr. Quinney took the passenger seat. The defendant
stated that he was crying at that point. Complying with
Mr. Quinney's instructions, the defendant drove to his
house while another vehicle followed. When the defendant
parked, Mr. Quinney hit him in the nose with the gun and
took the keys. The defendant grabbed a kitchen knife he
had in the car left over from his supper. When the
defendant stabbed Mr. Quinney with the knife, Mr. Quinney
dropped the gun, opened the passenger door, and tried to
exit the vehicle. The defendant grabbed Mr. Quinney by
the shirt collar, twisted the fabric around his hand, and
stabbed Mr. Quinney in the chest. Before the defendant
stabbed Mr. Quinney the second time, Mr. Quinney picked
the gun back up, holding it with the barrel facing away
from the defendant.

"On cross-examination, the defendant changed his story.
He added that, after he initially stabbed Mr. Quinney, he
stabbed at Mr. Quinney a second time as Mr. Quinney
clutched the stab wound and tried to open the car door.
The defendant grabbed Mr. Quinney's collar to pull him
back into the vehicle only after jabbing at Mr. Quinney
who was attempting to retreat. The defendant stabbed Mr.
Quinney again after he pulled Mr. Quinney back into the
car and Mr. Quinney had picked up his gun, holding it
with the barrel facing away from the defendant.

"Mr. Quinney again tried to move away from the defendant,
but the defendant followed him out of the passenger side
of the car. The two men struggled until they both fell in
the ditch at the front of the defendant's residence, Mr.
Quinney landed face down with his head on the defendant's
knees and his body across the defendant's legs. Mr.
Quinney lay unmoving with his gun arm tangled in his
shirt. While in that position, the defendant stabbed Mr.
Quinney several more times. The defendant denied
inflicting injuries to Mr. Quinney's genitals and stated

that the stab wounds to Mr. Quinney's throat must have been exit wounds to where he stabbed Mr. Quinney in the back of the neck. In spite of his denial, the defendant admitted on cross-examination that he stabbed Mr. Quinney in the throat, as opposed to the neck. The defendant averred that he was afraid because he did not want his family's sanctuary violated.

"The defendant looked up and saw the driver from the other vehicle approaching with some rope and duct tape in his hands. The defendant jumped up, ran to the rear of his house, and kicked in the back door. The defendant told his wife that somebody was trying to kill him and wedged a chair under the doorknob. The defendant instructed his wife to not let them in. The defendant again reported that he was crying. After awhile, the defendant had his wife photograph him. Then, he changed clothes and went outside to move the body. The defendant's wife placed his bloody clothing in a plastic bag.

"The other vehicle and its driver had left when the defendant exited his house. The defendant pulled Mr. Quinney's shirt off, grabbed him by the hand, and began to drag the body. Mr. Quinney's oversized trousers and underpants had shifted to his ankles when Defendant stopped by the carport to rest. At that point, the defendant removed Mr. Quinney's remaining clothes and put them in the corner of his backyard. The defendant then pulled Mr. Quinney up the levee by his feet and down the levee by his hand. After stopping for a rest, the defendant grabbed Mr. Quinney's legs and dragged him to where the body was discovered. The defendant returned home, collected Mr. Quinney's clothing, and gave them to his wife to bag. The defendant picked up the gun and the knife, put them in a brown paper bag, and individually dropped the gun, the knife, and the bag in a bayou as they left town. They threw the bag with Mr. Quinney's clothing into a dumpster.

"After the defense rested, the prosecution recalled Sergeant Bates as a rebuttal witness. Sergeant Bates testified that the lock on the defendant's back door had been intact when investigators searched the home. Sergeant Bates also refuted testimony by the defendant that he and his wife stopped taking pictures because the film ran out. He averred that there were fourteen unexposed frames left on the disposable camera."

14

## Law and Analysis

Grounds Nos. 2, 3, 4 - Mental Incapacity & Insanity

Richards' contends his defense counsel was ineffective for failing to adequately investigate, prepare, and present evidence of Richards' history of mental illness, thereby failing to show Richards was incompetent to assist with his defense and/or incompetent to stand trial and depriving Richards of the defense of insanity at the time of the offense. Richards further contends the trial judge erred in failing to stop the proceedings for a determination of Richards' competency. Richards raised these issues in his application for post-conviction relief, which was denied by the Louisiana Courts. The Louisiana Third Circuit Court of Appeal stated that Richards had not presented sufficient evidence to show that he did not know the difference between right and wrong at the time he committed the offense, he did not prove he had ineffective assistance of counsel, and the trial judge did not err because he failed to stop the proceedings for a determination of Richards' competency (Doc. 11, Ex. 20, p. 29/32).

To establish that his legal representation at trial fell short of the assistance guaranteed by the Sixth Amendment, a convicted defendant must meet the two-pronged test set forth by the Supreme Court in Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). He must show that his counsel's performance was both deficient (i.e., that counsel did not provide reasonably

15

effective assistance under prevailing professional norms) and prejudicial (i.e., that errors by counsel "actually had an adverse effect on the defense).   The former component of the test authorizes only "highly deferential" judicial scrutiny, requiring the defendant to overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy.   On the latter component, it is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding; rather, he must demonstrate a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. Anderson v. Collins, 18 F.3d 1208, 1215 (5th Cir. 1994), and cases cited therein.   Also, U.S. v. Segler, 37 F.3d 1131, 1136 (5th Cir. 1994).

Counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.   Nelson v. Hargett, 989 F.2d 847, 850 (5th Cir. 1993), citing Strickland v. Washington, 466 U.S. 668, 691, 104 S.Ct. 1052, 2066 (1984).   A defendant or petitioner who alleges a failure to investigate on the part of his counsel must allege with specificity what the investigation would have revealed and how it would have altered the outcome of the trial.   Nelson, 989 F.2d at 850, citing United States v. Green, 882 F.2d 999, 1003 (5th Cir. 1989).   Under Strickland, even where trial counsel has failed to adequately

16

investigate a case, a defendant must demonstrate that he has been prejudiced by his counsel's failure.  See  Lockhart v. McCotter, 782 F.2d 1275, 1282 (5th Cir.1986), cert. den., 479 U.S. 1030, 107 S.Ct. 873 (1987).  To show prejudice, the petitioner must prove that an alleged breach of his attorney's duty to investigate resulted in an actual and substantial disadvantage to the course of his defense.  Baldwin, 704 F.2d at 1333.  In a habeas proceeding alleging ineffective assistance of counsel, the petitioner has the burden of proof.  U.S. v. Chavez, 193 F.3d 375, 378 (5th Cir. 1999), citing Clark v. Collins, 19 F.3d 959, 964 (5th Cir. 1994), cert. den., 513 U.S. 966, 115 S.Ct. 432 (1994).

Richards claims his attorney should have raised the insanity defense because he has a long medical history of schizophrenia.  In Louisiana, a legal presumption exists that a defendant is sane at the time of the offenses.  La.R.S. 15:432.  To rebut the presumption of sanity and avoid criminal responsibility, defendant has the burden of proving the affirmative defense of insanity by a preponderance of the evidence.  La.C.Cr.P. art. 652.  Criminal responsibility is not negated by the mere existence of a mental disease or defect.  To be exempted of criminal responsibility, defendant must show he suffered a mental disease or mental defect which prevented him from distinguishing between right and wrong with reference to the conduct in question.  La.R.S. 14:14; State v. Williams, 346 So.2d 181, 186 (La. 1977).

The record shows, in Richards' attachments to his motion for post-conviction relief, that on April 11, 2005 Richards' defense attorney, Brian Mosely, asked to have Richards sign and date a release form for Richards' Veterans Administration Medical Center ("VAMC") records (Doc. 11, Ex. 17, p. 842 or 42/50).  Mosely apparently knew in April 2005 that Richards was receiving medical care at the VAMC.  The record further shows that Mosely requested Richards' medical records from the VAMC on April 13, 2006 (Doc. 11, Ex. 17, p. 844 or 44/50).  The VAMC responded and mailed Richards' medical records to Mosely on April 14, 2006 (Doc. 11, Ex. 17, p. 846 or 46/50).

Richards did not plead not guilty by reason of insanity; instead, he just pled not guilty.  On May 26, 2006, during the second day of trial, Richards testified that he had been going to the VAMC for treatment for twenty years (Doc. 12, Ex. 7, p. 44/50).  Richards further testified that, at the time of the offense, he had not slept for six days and he felt like he "[didn't] know what's coming and what's going" (Doc. 12, Ex. 7, p. 44/50).  Richards testified that he then checked into the VAMC so he could get one good night of sleep (Doc. 12, Ex. 7, pp. 43/50-45/50).  Richards' defense attorney then offered Richards' VAMC medical records into evidence and they were admitted without objection (Doc. 12, Ex. 7, p. 45/50; Doc. 11, Ex. 13, p. 24/50).  Richards contends his attorney did not offer his complete medical records at that time.

18

At no time, before or during trial, did Richards or his attorney state that Richards was unable to assist in his defense or that he was unable to understand the proceedings.

Richards' medical records (as supplemented by Richards in his motion for post-conviction relief with the VAMC records from Memphis, Tennessee) reflect a diagnosis of schizophrenia and intoxication in October and November 1994 (Doc. 11, Ex. 5, p. 34/50), but also show that it was suspected, but not determined, that drugs were part of the cause of Richards' hallucinations at that time (Doc. 11, Ex. 5, pp. 28/50, 30/50). In April 1995, the VAMC records show Richards suffered from schizophrenia (Doc. 11, Ex. 11, p. 5/50), or a "possible schizotypal personality disorder," and had been taking cocaine (Doc. 11, Ex. 12, pp. 14/50, 16/50).

In April 1997, the Memphis VAMC records showed Richards had not taken any medication in quite a long time, but he denied any hallucinations and acknowledged he was very short-tempered (Doc. 11, Ex. 12, p. 13/50). Richards' VAMC records from Alexandria, Louisiana reflect that he was transferred from the VAMC in Memphis in November 1997 with a diagnosis of schizophrenia and prescriptions for Risperidone and Cogentin (Doc. 11, Ex. 12, p. 11/50). Richards' VAMC records from Memphis in 2004 show he had a psychotic disorder induced by substance abuse and he suffered from polysubstance use and dependence (Doc. 11, Ex. 19, p. 1/50).

On March 2, 2005, Richards VAMC records from Alexandria show

19

he complained of suicidal thoughts and inability to sleep, and that he had been taking Cogentin "all day long" in order to rest (Doc. 11, Ex. 18, p. 9/50).  Shortly after Richards arrived at the VAMC that day, the police contacted the VAMC stating they wanted to interview Richards regarding a homicide that occurred a week prior (Doc. 11, Ex. 18, p. 9/50).  Dr. Aguirre, the chief of psychiatry, then evaluated Richards and found he was not actively psychotic and denied auditory or visual hallucinations, so Richards was discharged into the custody of the police the next day (Doc. 11, Ex. 18, p. 9/50).

Although Richards points to evidence of a history of schizophrenia, the evidence also indicates that Richards has a history of substance abuse.  The medical evidence shows Richards was abusing drugs one year before the offense, and within the week following the offense, and the offense itself involved Richards' purchase of illegal drugs from the victim; their dispute involved Richards' alleged failure to pay the victim for illegal drugs (Doc. 12, Ex. 8, p. 33/50).  Since Louisiana law specifically provides that an offender's voluntarily drugged condition at the time of the commission of an offense does not exempt the offender from criminal responsibility, La. R.S. 14:15, Richards' attorney's appears to have made a strategic decision not to plead insanity at the time of the offense, due to the apparent difficulties in proving it. Richards has not adduced evidence to show that he was suffering

20

from delusions or paranoia due to schizophrenia (rather than drugs or alcohol) at the time of the offense which impaired his judgment to the point that Richards was unable to distinguish right from wrong.

Richards also contends his attorney should have informed the court that he was not mentally competent to stand trial. La.C.Cr.P. art. 641 states, "Mentally incapacity to proceed exists when, as a result of mental disease or defect, a defendant presently lacks the capacity to understand the proceedings against him or to assist in his defense." In Louisiana, the defendant carries the burden of establishing that he lacks the capacity to understand the object, nature and consequences of the proceedings against him, and that he is unable, in a rational and factual manner, to consult with counsel in a meaningful way, and to assist in his defense. State v. Narcisse, 426 So.2d 118 (La.), cert. den., 464 U.S. 865, 104 S.Ct. 202 (1983). Nothing in the trial record indicates that Richards was unable to assist in his defense or understand the proceedings before or during trial due to his schizophrenia, and that a mental status examination was necessary. Moreover, Richards has not contended in his habeas petition that he was unable to assist in his defense or understand the proceedings. The mere fact that Richards had a history of schizophrenia was insufficient to show a current inability to stand trial. Therefore, Richards has not shown that his defense counsel erred by

not pleading that Richards was incompetent to stand trial, or that the trial judge erred by not halting the trial for Richards to undergo a mental status examination.  The mere fact that Richards' attorney introduced his medical records at trial did not indicate to the judge that Richards was currently unable to stand trial. Compare, <u>Stewart v. Stalder</u>, 2007 WL 1890706 (E.D.La. 2007).

Therefore, Richards has not shown that the Louisiana courts' denial of his ineffective assistance of counsel claims, with regard to an insanity defense and mental incompetence, was based on an unreasonable determination of the facts in light of the evidence presented.

These grounds for relief are meritless.

<u>Ground 1 - Sufficiency of the Evidence</u>

Richards also contends the evidence was insufficient to convict him of second degree murder, and thus violated his Sixth and Fourteenth Amendment constitutional rights.  Specifically, Richards contends the evidence showed he and the victim had an argument, the victim threatened him, then later attacked him as he was closing his store by hitting Richards over the eye and on the forearm with a gun, then forcing Richards to drive him home. Richards contends that, while they were in the car, he overcame the victim and stabbed and killed him.  Thus, Richards contends the evidence does not show he had the specific intent to kill the victim, but instead acted in self-defense or committed manslaughter

22

in the heat of the moment.  The Louisiana courts reviewed this claim on appeal and found that a rational trier of fact could have concluded that Richards failed to establish the necessary mitigating factors by a preponderance of the evidence, that the jury could have reasonably discounted Richards' self-serving testimony and believed the victim was unarmed, and could also have concluded the victim did not attempt to rob Richards, but that Richards attacked the victim because he did not want to pay the victim for his illicit drugs.[1]

Habeas relief on a claim of insufficient evidence is appropriate only if it is found that, upon the record evidence adduced at trial, no rational trier of fact could have found proof of guilt beyond a reasonable doubt.  West v. Johnson, 92 F.3d 1385 (5th Cir. 1996), cert. den., 520 U.S. 1242, 117 S.Ct. 1847, 137 L.Ed.2d 1050 (1997), citing Jackson v. Virginia, 443 U.S. at 322-26, 99 S.Ct. at 2791-92.  To apply this standard, the court looks to elements of the offense as defined by state substantive law.  Donahue v. Cain, 231 F.3d 1000, 1004 (5th Cir. 2001).  All credibility choices and conflicting inferences are to be resolved in favor of the verdict.  A determination of a factual issue made by a State court shall be presumed correct, and the petitioner shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.  Ramirez v. Dretke, 398 F.2d 691,

---

[1] Richards, 956 So.2d at 171-173.

693 (5th Cir. 2005).

La.R.S. 14:30.1 defines second degree murder, in pertinent part, as follows:

> **§ 30.1. Second Degree Murder**
> A.  Second degree murder is the killing of a human being:
> (1) When the offender has a specific intent to kill or to inflict great bodily harm;.

La.R.S. 14:20 provides for the defense of self-defense, in pertinent part:

> **§ 20. Justifiable homicide**
> A homicide is justifiable:
> (1) When committed in self-defense by one who reasonably believes that he is in imminent danger of losing his life or receiving great bodily harm and that the killing is necessary to save himself from that danger;

La.R.S.14:31 defines the offense of manslaughter, in pertinent part, as follows:

> **§ 31. Manslaughter**
> Manslaughter is:
> (1) A homicide which would be murder under either Article 30 (first degree murder) or Article 30.1 (second degree murder), but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self control and cool reflection.  Provocation shall not reduce a homicide to manslaughter if the jury finds that the offender's blood had actually cooled, or that an average person's blood would have cooled, at the time the offense was committed;... .

To reduce second degree murder to manslaughter, defendant must present evidence to show by a preponderance that the homicide was committed in "sudden passion" or "heat of blood" immediately caused

by provocation sufficient to deprive an average person of his self control and cool reflection.  "Sudden passion" and "heat of blood" are factors which mitigate against finding a defendant as culpable as a person who commits a homicide without the occurrence of any extenuating event.  State v. Journet, 629 So.2d 1387, 1390 (La. App. 3d Cir. 1993).  These factors need not be affirmatively established but may be inferred from the circumstances of the crime.  State v. Brumfield, 639 So.2d 312, 317 (La. App. 4th Cir. 1994), citing State v. Smith, 571 So.2d 133 (La. 1990), and State v. Thompkins, 403 SO.2d 644 (La. 1981).  Provocation is a question of fact to be determined by the jury.  Smith, 571 So.2d at 136.

Justification is a "perfect" defense which negates criminal culpability, while provocation or "heat of blood" is an "imperfect" defense which only mitigates criminal culpability.  State v. Dill, 461 So.2d 1130, 1136-37 (La. App. 5th Cir. 1984), writ den., 475 So.2d 1106 (La. 1985), citing State v. Peterson, 290 So.2d 307 (La. 1974).  Also, State v. Rader, 609 So.2d 857, 862 (La. App. 5th Cir. 1992); State v. Overton, 596 SO.2d at 1359.

Therefore, in reviewing a claim that the defendant acted in "sudden passion" or "heat of blood," the habeas court must determine whether, viewing the evidence in the light most favorable to the conviction, a rational trier of fact could have found those mitigating factors were not established by a preponderance of the evidence.  See State v. Overton, 596 So.2d at 1359, and cases cited

25

therein; Brumfield, 639 So.2d at 317, citing State v. Lombard, 486 So.2d 106. 111 (La. 1986); Cupit, 28 F.3d at 542.

In Richards' case, testimony from Appifanny Randall (Doc. 11, Ex. 26, pp. 11/50-19/50), Gwendolyn Davenport (Doc. 14, pp. 12/50-15/50), and Richards (Doc. 12, Ex. 6, pp. 27/50, 38/50-42/50) showed the victim and Richards had an argument, then the victim left the store, returned later, they argued, and the victim left again and returned again.  According to Richards, the victim forced Richards to drive him to Richards' home, where they began to before exiting the car (Doc. 12, Ex. 6, pp. 47/50-50/50; Doc. 12, Ex. 7, p. 1/50).  Richards testified that he stuck the victim with a dinner knife, and a struggle ensued (Doc. 12, Ex. 7, pp. 1/50-3/50).  Richards testified the victim dropped his gun and tried to get away after Richards, but Richards pulled him back and stabbed him several more times (Doc. 12, Ex. 7, pp. 3/50-12/50).

The forensic evidence showed the victim had been stabbed about nineteen times, and his genitalia had been skinned and partially removed (Doc. 12, Ex. 4, pp. 44/50-46/50).  Although Richards argues the victim's genitalia were either torn off (when he dragged the victim away naked) or were eaten by animals, the forensic evidence showed they were removed with a knife.  Most condemning was Richards' admission that he became the aggressor when the victim dropped his gun and tried to get away after Richards stabbed him once; Richards admitted he then pulled him back and stabbed him

26

several more times (Doc. 12, Ex. 7, pp. 3/50-5/50, 10/50; Ex. 8, pp. 43/50-44/50). Richards also admitted he dragged the victim's body away to hide it, and contends the victim's clothes fell off along the way (Doc. 12, Ex. 6, p. 21/50-28/50; Ex. 8, p. 50/50).

The jury evidently found the facts that Richards admitted that he pulled the victim back to continue stabbing him after the victim dropped his gun and tried to get away from Richards, and the victim was stabbed about nineteen times and his genitalia were skinned and partially removed with a blade, indicated that Richards did not simply act in the heat of the moment or solely in self-defense. Instead, the evidence, including Richards' own testimony, shows Richards became the aggressor after the victim tried to retreat, negating the self defense theory and indicating that Richards acted deliberately and with the specific intent to kill the victim, then tried to hide the body.

When viewed in the light most favorable to the verdict of second degree murder, it is clear that a rational trier of fact could have found there was sufficient evidence that Richards had the specific intent to kill the victim, and did not kill him in self-defense or in the heat of the moment. Therefore, Richards has not carried his burden of proving that the state courts' decisions on appellate review, that Richards' conviction is supported by sufficient evidence, were based on unreasonable determinations of the facts in light of the evidence.

This ground for relief is also meritless.

Conclusion

Based on the foregoing discussion, IT IS RECOMMENDED that Richards' habeas petition be DENIED AND DISMISSED WITH PREJUDICE.

Under the provisions of 28 U.S.C. Section 636(b)(1)(C) and Rule 2(b), parties aggrieved by this recommendation have fourteen (14) days from service of this Report and Recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within fourteen (14) days after being served with a copy of any objections or response to the District Judge at the time of filing.

**Failure to file written objections to the proposed factual findings and/or the proposed legal conclusions reflected in this Report and Recommendation within fourteen (14) days following the date of its service, or within the time frame authorized by Fed.R.Civ.P. 6(b), shall bar an aggrieved party from attacking either the factual findings or the legal conclusions accepted by the District Court, except upon grounds of plain error.** *See Douglass v. United Services Automobile Association*, 79 F.3d 1415 (5th Cir. 1996).

Pursuant to Rule 11(a) of the Rules Governing Section 2254 cases in the United States District Courts, this court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant. Unless a Circuit Justice or District

Judge issues a certificate of appealability, an appeal may not be taken to the court of appeals. **Within fourteen (14) days from service of this Report and Recommendation, the parties may file a memorandum setting forth arguments on whether a certificate of appealability should issue.** *See* 28 U.S.C. § 2253(c)(2). **A courtesy copy of the memorandum shall be provided to the District Judge at the time of filing.**

THUS DONE AND SIGNED in Alexandria, Louisiana on the ___ day of August, 2011.

JAMES D. KIRK
UNITED STATES MAGISTRATE JUDGE